UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LUIS BATISTA REYES,

                               **Plaintiff,**

               v.                                                1:21-CV-569
                                                                              (FJS/CFH)

ROBERT PAUL, *Former City of Troy*
*Police Department Sergeant*,

                               **Defendant.**
_____

**APPEARANCES**                                      **OF COUNSEL**

**BARKET EPSTEIN KEARON ALDEA**     **ALEXANDER R. KLEIN, ESQ.**
**& LOTURCO, LLP**                           **BRUCE A. BARKET, ESQ.**
666 Old Country Road
Suite 700
Garden City, New York 11530
Attorneys for Plaintiff

**PATTISON, SAMPSON, GINSBERG**      **RHIANNON I. GIFFORD, ESQ.**
**& GRIFFIN, PLLC**                          **MICHAEL E. GINSBERG, ESQ.**
22 First Street
P.O. Box 208
Troy, New York 12180
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. BACKGROUND

     This action stems from an incident that occurred in 1993, when an individual named Bryan Patterson (hereinafter "the victim") reported an assault and robbery that took place inside his room at a Super 8 motel in Troy, New York. *See* Dkt. No. 16-1, Def's Stmt. of Material

Facts, at ¶ 3.[1]  The victim reported to police that, in the early morning of December 2, 1993, he was awoken in his hotel room to find an individual on top of him demanding money, the assailant cut him on the ear and on his neck, and his wallet, credit cards, rug cutting knife, hat, Nintendo gaming system, and video games were missing.  *See id.* at ¶¶ 5-8.  Defendant Robert Paul, a former sergeant with the City of Troy Police Department, was assigned as the lead investigator on the case.  *See id.* at ¶ 9.

On the night and morning in question, Plaintiff Luis Batista-Reyes had rented the room across the hall from the victim's room.  *See id.* at ¶¶ 10-11.  According to Defendant's case narrative, Plaintiff rented the room with a "blonde 'hooker' named 'Ashley,'" also known as Laura Pullen/White (hereinafter referred to as "Ms. Pullen"), and an individual named Shannon Houser.  *See id.* at ¶¶ 14-15, 18.[2]  Ms. Houser provided Defendant with a Deposition of a Witness on December 8, 1993, in which she attested that Plaintiff assaulted the victim and stole a white bag containing a gaming console.  *See id.* at ¶¶ 19-20.[3]  The next day, Ms. Pullen provided Defendant with a Deposition of a Witness, in which she also attested that she rented a room at the Super 8 motel with Plaintiff from December 1, 1993 to December 2, 1993; and, at some point while there, Plaintiff returned to the motel room "'looking crazy' and holding a knife with blood on it."  *See id.* at ¶¶ 24-26.[4]

---

[1] The facts in this section are taken from Defendant's statement of material facts and, unless otherwise noted, are undisputed.  *See* Dkt. No. 16-1.

[2] Plaintiff admits that these facts come from Defendant's case narrative but denies the underlying nature of them.  *See* Dkt. No. 22-23, Pl's Response to Stmt. of Facts, at ¶ 14.

[3] Plaintiff admits that Ms. Houser made these allegations but denies the content of the allegations.  *See* Dkt. No. 22-23 at ¶ 20.

[4] Plaintiff admits that Ms. Pullen signed a statement containing such contents but denies the underlying allegations.  *See* Dkt. No. 22-23 at ¶ 26.

Defendant, the victim, and Ms. Pullen testified before the grand jury about the incident; and the grand jury indicted Plaintiff on January 18, 1994, on seven counts, including robbery in the first degree, robbery in the second degree, two counts of burglary in the first degree, two counts of assault in the second degree, and petit larceny. *See id.* at ¶¶ 29, 31. Plaintiff proceeded to trial on December 13, 1994, in which the victim, Ms. Pullen, and Investigator Christian Lamberston from the City of Troy Police Department testified. *See id.* at ¶¶ 33-34. Defendant did not testify at the criminal trial. *See id.* at ¶ 35. The jury returned a verdict on December 14, 1994, finding Plaintiff guilty on all seven counts of the indictment. *See id.* at ¶ 37. The criminal court ultimately sentenced Plaintiff as a second felony offender to a term of 25 years to life in a New York State Correctional Facility. *See id.* at ¶ 38. The New York State Supreme Court, Appellate Division, Third Judicial Department upheld Plaintiff's conviction and sentence upon his appeal in January 1997. *See id.* at ¶ 40.

Sometime between 2000 and 2003, while incarcerated in a New York State Correctional Facility, Ms. Pullen exchanged letters with a prison minister named Robert Lawrenz (hereinafter referred to as "Pastor Lawrenz"), in which she stated that she "'wanted to right a wrong regarding Luis'" and "'to convey her apologies regarding what had happened with her testimony during his [criminal] trial.'" *See id.* at ¶¶ 41-42. Pastor Lawrenz gave a statement regarding those letters to the Albany County District Attorney's Office in 2017, and that office was ultimately appointed as a special prosecutor to investigate Plaintiff's claims of innocence. *See id.* at ¶¶ 42-43. As part of that investigation, Ms. Pullen signed a statement in 2017 essentially stating that she stood by her December 9, 1993 Statement "100%" and that it was entirely true and accurate. *See id.* at ¶ 45. Ultimately, after concluding its investigation, the Albany County District Attorney's Office consented to Plaintiff's request to vacate his

conviction pursuant to N.Y. Crim. Proc. L. § 440.10(g) "'[b]ecause of [Ms. Pullen's] shifting accounts, [her] credibility ha[d] been undermined to the extent that if the letters had been introduced at trial the result likely would have been different . . .'" *See id.* at ¶ 46. Plaintiff was released from prison in 2018. *See id.*

On May 19, 2021, Plaintiff commenced this action against Defendant in his personal capacity, alleging claims of false arrest, malicious prosecution, and fabrication of evidence pursuant to 42 U.S.C. § 1983.[5] *See* Dkt. No. 1, Compl., at ¶¶ 6, 32-57. In his complaint, Plaintiff alleges that, after the assault, the victim identified the perpetrator as having been a "Black male," with an afro, no distinctive accent, and wearing a long black jacket. *See id.* at ¶¶ 15, 17, 19, 21. Plaintiff, however, alleges that he is light-skinned, Hispanic, with a thick Spanish accent, did not have an afro in December 1993, and was wearing a waist-high royal blue jacket sporting the insignia of the New York Giants on the date in question. *See id.* at ¶¶ 16, 18, 20, 22. Although the victim did not identify the perpetrator's height or weight on the incident report, Plaintiff asserts that Defendant later coerced the victim to identify the perpetrator's height within two inches and the perpetrator's weight within ten pounds of Plaintiff's attributes. *See id.* at ¶ 27. Plaintiff also alleges that the victim was coerced to "accentuate his injuries" between the time of the incident and his testimony at trial. *See id.* at ¶¶ 28-29. Additionally, Plaintiff alleges that the victim reported that law enforcement returned his Nintendo console to him and claimed that it was recovered from Plaintiff when he was arrested, which was a "complete falsehood." *See id.* at ¶ 31.

---

[5] Although Defendant raised the affirmative defense of statute of limitations in his answer, neither party addresses the issue with respect to the pending motion. *See* Dkt. No. 8, Answer, at ¶ 65. The Court cannot find Plaintiff's exact release date from New York State custody in any of the parties' submissions; however, for purposes of this motion, the Court assumes that he was released after May 19, 2018.

In addition to allegedly coercing the victim's statements, Plaintiff alleges that Defendant did not recover any fingerprints from the scene – despite Plaintiff's fingerprints being on file and available to law enforcement for comparison – and Defendant did not recover any security camera evidence from the Super 8 motel. *See id.* at ¶¶ 23-24.  Plaintiff also alleges that the only witness to identify him as the perpetrator before the grand jury or at trial was "a drug-addicted prostitute[.]"  *See id.* at ¶ 25.  Based on all of these facts, Plaintiff claims that Defendant falsely arrested him, maliciously prosecuted him, and fabricated evidence by coercing witnesses and failing to investigate the matter properly.  *See id.* at ¶¶ 32-57.

Pending before the Court is Defendant's motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss Plaintiff's complaint in its entirety.  *See* Dkt. No. 16.  Plaintiff opposes the motion with respect to his malicious prosecution and fabrication of evidence claims.  *See* Dkt. No. 22.  Plaintiff withdrew his cause of action for false arrest in his memorandum of law in response to Defendant's motion.  *See id.* at 30.

## II. DISCUSSION

### A. Summary judgment standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The movant may satisfy this burden "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater*

*v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986)).

Once the movant meets this initial burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)). Specifically, the moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the non-movant] do not establish the absence or presence of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1)(A)-(B). The party opposing a motion for summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico*, 132 F.3d at 149) (other citation omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (citations omitted). "Rather, the nonmoving party must present 'significant probative evidence tending to support the complaint.'" *Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 U.S. Dist. LEXIS 4943, *9 (S.D.N.Y. Mar. 26, 2002) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).

### B. Plaintiff's malicious prosecution claim

Defendant contends that the Court must dismiss Plaintiff's malicious prosecution claim because probable cause existed to prosecute Plaintiff, and he cannot satisfy the malice element. *See* Dkt. No. 16-2 at 15-20. "To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show '(1) the commencement or continuation of a criminal

proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice.'" *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 734 N.E.2d 750, 752, 712 N.Y.S.2d 438 (N.Y. 2000) (internal quotation marks omitted)) (other citation omitted). "'[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York . . . .'" *Bertuglia v. Schaffler*, 672 F. App'x 96, 99 (2d Cir. 2016) (quoting [*Manganiello v. City of New York*, 612 F.3d 149,] 161-62 [(2d Cir. 2010)]). "Where . . . a grand jury indicted the plaintiff on the relevant criminal charge, New York law creates a presumption of probable cause that can only be overcome by evidence that the indictment 'was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith.'" *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quoting *Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir. 2000) (quoting *Marshall v. Sullivan*, 105 F.3d 47, 54 (2d Cir. 1996)); *accord Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 528 N.E.2d 157, 532 N.Y.S.2d 234, 236 (1988)).

The third and fourth elements are at issue in this case. There is no dispute that the grand jury indicted Plaintiff on seven counts, which included one count of robbery in the first degree, one count of robbery in the second degree, two counts of burglary in the first degree, two counts of assault in the second degree, and one count of petit larceny. *See* Dkt. No. 16-28, Indictment. As such, a presumption of probable cause to prosecute exists. To overcome that presumption, Plaintiff must point to evidence showing that fraud, perjury, police suppression of evidence, or other bad faith police conduct caused him to be indicted. To meet this burden, Plaintiff makes the following arguments: (1) Defendant improperly coerced Ms. Pullen to identify Plaintiff as the assailant, as evidenced by letters she sent Pastor Lawrenz and by evidence that Defendant

also coerced Ms. Houser and the victim to identify Plaintiff as the assailant; (2) Defendant failed to investigate the matter thoroughly; and (3) the prosecutor engaged in misconduct by withholding exculpatory information from the grand jury.  *See* Dkt. No. 22 at 17-26.

  To support his coercion argument, Plaintiff points to Ms. Pullen's letters that she wrote to Pastor Lawrenz while she was incarcerated.  In those letters, Ms. Pullen indicated that she told Plaintiff "how the D.A. threatened [her], gave [her] a script [etc.]," she "wanted to make it right," and she knew Plaintiff was "doing a 25-Life for something he didn't do!"  *See* Dkt. No. 22-14, Pullen 8/14/02 Letter, at 3-4.  In another letter, Ms. Pullen indicated that she had not heard back from Plaintiff, but she wanted to "<u>Right</u> the <u>WRONGS</u>" she had done, *see* Dkt. No. 22-15, Pullen Letter 10/2, at 3, and maybe "the Lord has other plans for him" in prison, *see* Dkt. No. 22-15, Pullen 10/31/02 Letter, at 2.  In a separate letter that Ms. Pullen sent Plaintiff, she stated that she was "SO sorry," and had "lived with this guilt over [Plaintiff] for years now," but she "was <u>TOLD</u> to say everything" and "was even made to <u>rehearse</u> [her] responses."  *See* Dkt. No. 22-17, Pullen Letter to Plaintiff, at 1.  Ms. Pullen further told Plaintiff that "[t]hey gave [her] a script," and "[s]aid it would be either [Plaintiff] or [her]."  *See id.*  According to Ms. Pullen, "[t]hey even told [her] to say [she] was scared of [Plaintiff]."  *See id.*  However, she "tried to help" and "contradicted [her]self 1,000 xs."  *See id.*

  Plaintiff also pointed to Ms. Houser's deposition testimony, in which she stated she was not in the victim's motel room, did not see anything happen, and anything contrary to that in her 1993 statement to the police was because she was "using drugs" and "told the police what they wanted to hear," "[w]hether it was true or not."  *See* Dkt. No. 22-13, Houser Depo, at 102:5-19.  In her original statement, Ms. Houser described having used crack cocaine several times on the night in question, including with Plaintiff, that she was in the victim's room with Plaintiff and

witnessed the assault and robbery, and that she knew that a prostitute named "Ashley" was in the room across the hall, which she confirmed after Defendant showed her a photograph of Ms. Pullen.  *See* Dkt. No. 22-12, Houser Stmt.

Relatedly, in the victim's deposition testimony, he stated that he believed the police arrested the right person because Plaintiff had rented a room across the hall from him and the police told the victim that they had found Plaintiff with his possessions, "[s]o the numbers add[ed] up."  *See* Dkt. No. 22-18, Patterson Depo, at 32:4-18.  The victim explained that, if he learned that Plaintiff did not have his possessions when he was arrested, that information could change his opinion of whether the police arrested the right suspect.  *See id.* at 33:9-16.  Plaintiff also notes that Defendant denied having lied to the victim about the fact that Plaintiff was not in possession of his Nintendo or wallet when arrested.  *See* Dkt. No. 22 at 25 (citing Dkt. No. 22-11, Def's Depo, at 108:6-10).

Plaintiff argues that there is a question of fact as to whether this "pattern of coercion" between Defendant and Ms. Houser, as well as Defendant and the victim, evidences Defendant's coercion of Ms. Pullen, the only eyewitness who testified at trial and identified Plaintiff as the assailant.  *See* Dkt. No. 22 at 22.  Plaintiff also points out that each of the above-described inconsistencies poses questions for a jury as to the witnesses' credibility that is inappropriate for summary judgment.  *See id.* at 25.

Notably, this is not a retrial of the criminal matter.  The issue of credibility does not go to the question of whether Ms. Pullen – or Ms. Houser or the victim – properly identified Plaintiff as the assailant, but whether Defendant *coerced* Ms. Pullen to identify Plaintiff as the assailant in her 1993 statement to the police, before the grand jury, or at trial.  To withstand

summary judgment, the non-movant cannot rely on mere conjecture but must come forward with some evidence in the record that supports his argument.

In this case, even looking at the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has not proffered sufficient evidence to show that Defendant coerced Ms. Pullen to testify to rebut the presumption that probable cause supported the prosecution. In Ms. Pullen's letters, she stated that the District Attorney – not Defendant – "threatened" her and "gave [her] a script" to read, although she did not explain how the District Attorney threatened her. *See* Dkt. No. 22-14 at 3. In her letter to Plaintiff, she vaguely stated that "they" told her to say everything she said in her 1993 statement, gave her a script, and told her to say that she was scared of Plaintiff. *See* Dkt. No. 22-17 at 1. Ms. Pullen did not identify who "they" were that threatened her in such a way, or what those threats constituted other than vaguely asserting that she believed she was identifying Plaintiff to keep herself from being arrested. *See id.* Ms. Pullen never identified Defendant in her letters, nor did she specifically identify the police or other law enforcement officers as those who coerced her. *See generally* Dkt. Nos. 22-14, 22-15, 22-16, 22-17.

Additionally, although Ms. Houser testified that she told the police "what they wanted to hear," "whether or not it was true," she admitted that she had been using a substantial amount of drugs in December 1993, and she did not state that law enforcement – or Defendant in particular – coerced her to tell them "what they wanted to hear." There are many reasons other than coercion that could have caused Ms. Houser to tell the police what they wanted to hear. There is also no evidence that the police made threats to Ms. Houser, used physical violence, or otherwise "coerced" her. Even if a jury found that Defendant had somehow coerced Ms.

Houser, such evidence would not establish that Defendant coerced *Ms. Pullen*, who testified against Plaintiff.

With respect to the victim, he remarked in his 1993 statement to the police that Defendant told him that the police arrested Plaintiff for assaulting and robbing him. *See* Dkt. No. 22-5 at 2. The victim stated that he did not know Plaintiff, so presumably he would not have known if the police arrested the true assailant. *See id.* However, as shown in his deposition, the victim believed that Plaintiff assaulted him because the police allegedly told him that they arrested Plaintiff in possession of the victim's gaming system and wallet. *See id.* Defendant denies that he told the victim this information. *See* Dkt. No. 22-11 at 108: 6-10. Notwithstanding Defendant's denial, it is undisputed that such underlying information was false; the police did not recover those items from Plaintiff upon his arrest. Even if a jury found that Defendant had lied to the victim about his items being in Plaintiff's possession upon his arrest, that evidence would not show that Defendant coerced *Ms. Pullen*, who testified against Plaintiff in the prosecution. That conclusion could only come from conjecture and speculation. Accordingly, the Court finds that Plaintiff has not met his burden to establish a question of fact as to whether Defendant coerced Ms. Pullen to identify Plaintiff as the assailant to overcome the presumption of probable cause.

The Court further rejects Plaintiff's claim that Defendant failed to investigate the assault and robbery. In Defendant's case narrative, which Plaintiff attached as evidence, Defendant identified his entire procedure in investigating the victim's assault. *See* Dkt. No. 22-4, Case Narrative. For example, Defendant remarked in that narrative that the victim was woken at 6:30 A.M. by an individual demanding money, a struggle ensued, the victim's wallet and rug cutting knife were stolen, and the victim could not identify the perpetrator. *See id.* at 1. Defendant

further noted that law enforcement was aware of a "lot of activity" in the room that Plaintiff rented, and the cleaning staff found apparent drug paraphernalia in the room. *See id.* When Defendant spoke with Plaintiff after he was arrested in an unrelated incident, Plaintiff admitted he had rented the room with "a blond hooker named Ashley," and "after he was 'done with his business' he left her with the room at 2:30AM." *See id.* at 2. Defendant also explained that the victim's wallet was found Friday, December 3, 1993, at approximately 10:20 A.M. outside, but after discussing the possibility of latent fingerprints being obtained from the wallet with Captain Mahar, Defendant felt such recovery would be improbable. *See id.*

Defendant further explained that, while investigating an unrelated burglary, Ms. Houser told Defendant that she was with Plaintiff at the Super 8, along with many other prostitutes, they left and returned when the sun was up, "they saw the victim's door open and they all entered the room and looked around as the victim slept, the others left her and [Plaintiff] in the room," she saw Plaintiff wake the victim up using the victim's knife, demand money, and tell the victim he would cut him. *See id.* at 3. Defendant further reported that Ms. Houser informed him that she "got scared and left," and Plaintiff ran out of the room a few minutes later and told her he cut the victim. *See id.* Defendant left Ms. Houser with another investigator and wanted her to be reinterviewed the next morning. *See id.*

In addition to Ms. Houser's statement, Defendant noted that he obtained depositions from Ms. Pullen and two other individuals, Deborah Arm and Lester Tillman. *See id.* Defendant also reported that Plaintiff turned himself into the Watervliet Police Department, wherein Defendant obtained a written waiver from him. *See id.* at 4. Defendant also obtained a deposition from the victim "for future reference" after he went to Troy to testify in a scheduled preliminary hearing, even though the hearing was ultimately canceled. *See id.* at 5.

Plaintiff additionally faults Defendant for not asking the Super 8 motel for its video footage; however, in 1993, it is unlikely any such footage existed. Furthermore, although Plaintiff argues that Defendant should have tested the wallet for fingerprints, Defendant considered and discussed this with his captain, who decided it probably would not render any results. Plaintiff also asserted that Defendant should have interviewed more witnesses. However, based on his case narrative, Defendant had statements from Ms. Houser and Ms. Pullen identifying Plaintiff as the assailant, he interviewed two other individuals, and Plaintiff admitted he had rented the motel room across from the victim for illegal activities on the night in question. "The Constitution does not require police to follow every lead, 'explore and eliminate every theoretically plausible claim of innocence,' or resolve all doubts about a victim's story before effecting an arrest or pursuing a prosecution." *Virgil v. Town of Gates*, 455 F. App'x 36, 40 (2d Cir. 2012) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *see Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)). The Court therefore finds that no reasonable jury could conclude that Defendant failed to investigate the matter such that it would rebut the presumption that probable cause supported the prosecution, and Plaintiff's speculation to the contrary does not create a question of fact.

Finally, with respect to Plaintiff's argument that prosecutorial misconduct in withholding information from the grand jury rebuts the presumption of probable cause, such argument is inapplicable in this matter because Plaintiff only brought this action against Defendant, a former police sergeant, rather than against the prosecutor. It is well-established that "[t]he personal involvement of a defendant in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Clark v. DiNapoli*, No. 1:09-cv-1037, 2011 U.S. Dist. LEXIS 118980, *16 (N.D.N.Y. Oct. 13, 2011) (McAvoy, S.J.) (citing *Wright v. Smith*, 21 F.3d 496,

501 (2d Cir. 1994)).  Plaintiff does not allege that Defendant was at all responsible for the evidence that the Rensselaer County District Attorney's Office chose to present before the grand jury, nor could he make such an allegation because it would not be reasonably foreseeable that Defendant's alleged failures in investigating the assault and in coercing Ms. Pullen would result in the prosecutor's independent decision not to present exculpatory evidence to the grand jury.  *See Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

Because the Court finds that Plaintiff has failed to satisfy his burden of rebutting the presumption that his prosecution was supported by probable cause, it need not consider whether Defendant acted with "actual malice."  As such, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's malicious prosecution claim.

### C. Plaintiff's fabrication of evidence claim

"Fabrication of evidence claims relate to the right 'not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity.'"  *Jeanty v. City of Utica*, No. 6:16-cv-00966 (BKS/TWD), 2021 U.S. Dist. LEXIS 7737, *62 (N.D.N.Y. Jan. 14, 2021) (Sannes, J.) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000)).  "The traditional elements for such a claim are: '(1) [an] investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.'"  *Id.* at *62-*63 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012)).

The second element is the only element in dispute.  Plaintiff made clear in his memorandum of law that his fabrication of evidence claim is solely based on his belief that there are questions of fact about whether Defendant coerced Ms. Pullen and Ms. Houser to

provide inculpatory statements to law enforcement – and, in Ms. Pullen's case, to the grand and petit juries – which led to the deprivation of his liberty.  *See* Dkt. No. 22 at 27.  However, as the Court found, above, Plaintiff has not raised a question of fact as to whether Defendant coerced Ms. Houser's or Ms. Pullen's police statements and testimony because he merely relies on conjecture and speculation to support his argument.  For the same reasons, the Court finds that there is no question of fact regarding such coercion to sustain Plaintiff's fabrication of evidence claim.  As such, the Court grants Defendant's motion for summary judgment with respect to this claim.  *See id.*

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 16, is **GRANTED** in its entirety;[6] and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close the case.

**IT IS SO ORDERED.**

Dated:  March 1, 2023
　　　　Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

---

[6] Since the Court dismisses each of Plaintiff's remaining causes of actions on the merits, it does not need to address Defendant's argument that he is entitled to qualified immunity.